May it please the court, excuse me. My name is Megan Batoon and I represent Clark, Cooper and Green, the plaintiff's appellants in this case. Clark, Cooper and Green now appeal the District Court's grant of summary judgment, dismissing their First Amendment retaliation claims, hostile work environment claims, and other related discrimination claims. And because we're here on summary judgment, essentially that the District Court found that this case would not be going to a jury, I want to emphasize the summary judgment standard, which is that this court will only affirm the District Court's grant of summary judgment if after an independent review of the facts and the evidence in the record, it determines that there's no genuine issue of material fact and that the defendants are entitled to judgment as a matter of law. And for my purposes today, I want to focus on three general categories of genuine issues of material fact that precludes summary judgment as to Clark, Cooper and Green's First Amendment retaliation claims and hostile work environment claims. And those are first, that Clark, Cooper and Green have sufficiently established this timeline of events from which it can be plausibly inferred that there is a causal connection between the First Amendment protected speech that they engaged in and the adverse employment actions against them. Second, that Clark, Cooper and Green have sufficiently established that the reasons given by the city for their adverse employment actions were pretextual. And third, that Clark, Cooper and Green have sufficiently established that they suffered harassment sufficiently severe or pervasive to affect a term, condition, or privilege of their employment. And I'll dive right into the First Amendment retaliation claims. So Clark, Cooper and Green have established this timeline of events. Are you saying Clark and Green or Clark, Cooper and Green? Clark, Cooper and Green. Yes. Yes, Your Honor. So they have established this timeline of events from which a jury could plausibly infer that there is a causal connection between their First Amendment protected speech when they went to speak to the FBI and their adverse employment actions when they were fired or demoted. And the timeline is this. Clark, Cooper and Green were all 30-year employees of the Alexandria Police Department. So they work for decades of their careers. And then they find out about this incident of police brutality. It's a police officer-involved beating of an unarmed man that they believe is being covered up by the police department. And so at the end of March 2020, they report this incident to the FBI. This is the First Amendment protected speech taking place at the end of March 2020. Now right after that, they're all subjected to a flurry of investigatory activity by the department. Right after that, you've got it's April of 2020, Green starts to be investigated. He says that he starts to be investigated, but he's purportedly investigated for payroll fraud, they say. But as he goes in, he says, they were only asking me about this police brutality incident. They were only asking me about the beating of the unarmed man. Green actually ends up being investigated five total times before he's demoted at the end of February 2021. So going back to our timeline, you have the speech to the FBI at the end of March 2020. Green starts being investigated right after that in April. In May, Cooper starts being investigated. He says he goes in for this investigation, and he is told by an attorney for the city that going to the FBI was a fatal mistake. Now, doesn't the city take the position that they were not aware of the communication with the FBI until July? Correct, Your Honor. And that, I would say, is an issue of material fact for a jury to decide. To my mind, I think this is quite clear. If you look at Cooper's deposition, I'm sorry, Cooper's first interrogation, it takes place in May of 2020, and they're discussing the FBI. So they at least knew about that by, and that record site is 4054. In addition, Cooper's affidavit at 1409, he says he went in May of 2020 and was told by an attorney for the city that going to the FBI was a fatal mistake. So we're at May. So several months after, the next month is June, Clark starts being investigated. He, again, he says in his affidavit, he says, I was brought in to, I was brought in for an investigation because I went to the FBI. And he's fired later that month subsequent to a second investigation. So then again, we have all these men being investigated in this kind of flurry of activity following their speech to the FBI. And so this timeline alone really establishes that a reasonable jury could look at this information and say, there is a causal connection between this First Amendment protected speech and the adverse employment action that happened subsequent. And from that, I'll move on to the second category of of genuine issues of material fact. And those are that Clark, Cooper, and Green have established that the reasons given by the city for their firings and demotion were pretextual. So I'll take them one by one. So the city has to be able to show that that it would have taken these actions against these men, even in the absence of the protected speech. And we argue that they that they simply cannot. Is there a civil service procedure in Louisiana for police officers? Yes, yes, Your Honor. Have they pursued that? Do you mind if I grab my water? I just need a second. Sure, sure. Hmm. So have they pursued the civil service? Yes. In relation to? Their terminations. They filed EEOC complaints. And I mean, yeah, this the state civil service procedures. I'm not sure. Okay. Yeah. But to just I just I'll return to to Green. I'll just start with Green's, the pretextual reasons for for his demotion. So first, you have this kind of compelling timeline of events. And then he's he's demoted at the end of five investigations that that that are really intricate that at least the start of these investigations are really intricately linked to the speech that he made with the FBI. So the city really can't come forward now and say, and say, you know, we, we would have engaged, we would have done this adverse employment action, even in the absence of this protected speech, because of how connected these these incidents are. So Green is investigated, as I said, five times, nothing really comes of these investigations until the end of February of 2021. He's he's demoted for for he's they purport that he lied during one of these investigations. And they purport that he gave an employment list to Cooper. And both of these reasons he disputes, he disputes that he lied, and he disputes that giving the employment list was sufficient to to demote him. But but viewing this evidence all in all together, a reasonable jury could could find that there's this causal connection and that the reason given by the city for demoting Green was pretextual. And it's the same for Cooper. So Cooper goes in, as I said, he was told for this first investigation going to the FBI is a fatal mistake. He's asked during this investigation about about this, this incident of police brutality. And if you look at his, his polygraph itself, so he actually was fired for purportedly lying during this polygraph. He disputes that he lied during the polygraph. But if you look at the polygraph itself, this is 6196. What are they asking him about in this polygraph, the beating of the unarmed man, they're asking him about this incident of police brutality. So again, this the city cannot come now and say that that the reason that that it would have engaged as adverse employment action, even in the absence of the protected speech, because of these circumstances, as they've alleged. And then finally, we have Clark, similar to Cooper and Green, he's he goes in for an investigation, he says in his affidavit, they called me in for this investigation because I went to the FBI. Now he's a second investigation is launched against him. And he is ultimately terminated for violating the NCIC database rules in the department that he they claim that or he he uses he uses NCIC database for personal purposes, so that they fired him for that. But Clark's evidence of this being pretextual has more to do with the circumstances and the way that this NCIC system was treated within this department. So the his evidence was that there's multiple affidavits showing that there was no training in this system. I don't understand what training you need in order to say that NCIC has some sort of confidential information, right? And the officers are not supposed to go into it, except for business purposes. Right, right. I don't understand what training has to do with that. Right. I think his point was just to show that, that it wasn't treated in a in a sense as this very desirable offense. I'm sorry, did he show that other people were misusing it also? He did. So the only evidence that we have in this record of other people misusing this, this system is an officer named Fairbanks who received a reprimand, an officer named Green who received a suspension, himself who was fired, and he also presented this evidence that the person in charge of reporting this recertification for these officers within this department had been fraudulently reporting the results. But recertification only has to do with training, right? With training and... How to use it. With relation to the system. So all of this really just is to say that his kind of quantum of evidence related to this system is to be able to present this all to a jury. So a jury sees Clark, who's worked in this department for 28 years, going along, all of a sudden, okay, he's fired for misusing the NCIC system. Would the evidence in front of the jury be, oh, well, we take this misuse very seriously, and here are the other people that we have fired for this system, for misusing the system? Or that we train you in this system, and no, that's not what it would show. It would show a department that maybe doesn't take this system as seriously, and therefore, a reasonable jury could determine that this is pretextual. I think the city's response there is that he was an officer, and was he the assistant chief at the time? Anyway, he was a top-level officer. Right. And it was his responsibility to follow all the rules. Yes. Yes, Your Honor. So the punishment for that has to be more severe. Yes, and I . . . Is that a fact issue? I think it is, and I think this really goes, again, to this issue of whether or not a jury should be permitted to hear this evidence, and whether or not this is sufficient evidence of pretext. Whether or not the city can actually come forward and establish this Mount Healthy defense of, you know, we would have engaged these adverse employment actions against these men, even in the absence of their protected speech. And I think the timeline, I think the compelling timeline, plus this evidence of pretext, really does establish this issue as one that should be heard by a jury. In the time that I have remaining, I'd like to turn to a separate subject, which is that Clark, Cooper, and Green have sufficiently established that they were subjected to harassment sufficiently severe or pervasive to affect a term, condition, or privilege of employment. And for our purposes here, I really just want to focus on kind of one piece of evidence, and that has to do with the fact that as Clark, Cooper, and Green rose through the ranks of this department, becoming commanding officers, they started to be called the Colored Coalition. And the district court made a finding about this, or the district court really accessed this evidence and said, you know, the fact that the chief of police referred to his command, or his leadership team as the Colored Coalition, yes, I find that that is, it's related to race, and it's objectively and subjectively offensive, but that it just didn't rise to this level of severe pervasive harassment. But I think that this kind of fails to take into account the other thing that happened when Clark, Cooper, and Green rose through the ranks, and that is that they started to be circumvented in their positional authority. All three of these men allege that as they reached higher ranks in the department, they started to become circumvented. And so I think that this, the fact that they were called the Colored Coalition— What is, what do you know, that's subjective. What objective proof do you have of that to create a fact issue? And besides that, that's even assuming that somehow you can be harassed while you're also being promoted, presumably, over white officers as well. I mean, this one's very difficult for me to comprehend. I understand. It really, just to answer your question, just that this is the testimony of Clark, Cooper, and Green, that they were circumvented in their authority. Okay. And I'll reserve that. All right. Thank you. Thank you. No chance for rebuttal. Mr. Gowra. All right. Hello. Good morning. May it please the Court. Joshua Darrow, Jr. on behalf of the City of Alexandria, the appellee in this matter. What we're asking is that the Court affirm the District Court's motion for summary judgment, or the granting of the motion for summary judgment. This case is really about three high-level employees, good men, who succeeded at the APD, had an opportunity to succeed further in the APD, and unfortunately, in large part due to their personal animus towards the then chief, made some mistakes and decisions that cost them their statuses with the department. That's what this case is about. Just by way of roadmap, briefly, I'm going to discuss the race discrimination claims. I'll spend some time on the hostile work environment claims, and of course, then I'll end with the retaliation claims. Once you've heard the rest of the story, as Paul Harvey would say, we're going to ask you to affirm the District Court's ruling. The first point, of course, is that the District Court correctly found that race discrimination, their claims of race discrimination, fail as a matter of law. First, they don't establish the prima facie case. It's easier to deal with Cooper and Green on that issue because they don't show, of course, that they were replaced by someone outside of their race. In fact, in the case of Green, Green was replaced by someone that was his race, of course, then Lieutenant Van Dyke. He's now a commissioner of public safety, but then Lieutenant Van Dyke, who was also a black man. Then, of course, you have Cooper, who was the assistant chief at the time. He was replaced by a black woman. So they fail in that regard, and they don't even really attempt to identify a comparator. Although, if you do look closely at Mr. Clark's affidavit, he actually does identify a comparator, a white male, Kenneth Raschel, who was a lieutenant who was fired just months before Cedric Green for very similar conduct. In that situation, what you'll see is that Mr. Raschel, there was a complaint filed against him for race discrimination. He allegedly had threatened someone, and eventually he denies those claims, of course. He's subjected to a polygraph. Once he gets to the polygraph, he then tells the truth. Very, very similar to what happens with Mr. Green. Mr. Green is asked questions about disseminating information to Mr. Cooper or his lawyer for purposes of use in a civil service appeal. I know that Judge Jones asked about the civil service appeal. Yes, there were two civil service appeals. Mr. Cooper, he filed his civil service appeal. He lost before the board. He did not take it any further. Mr. Green, he filed a civil service appeal. He lost before the board. He did not take it any further. Mr. Clark filed a civil service appeal. Unfortunately, his appeal was untimely. The board denied it. He went to the district court. The district court tried to give him the opportunity to pursue it. The Third Circuit in Louisiana said, no, it was untimely. So, there was the pursuit of those civil service appeals. But back to Mr. Green. Mr. Green, just like Mr. Rashelle, is faced with a polygraph. And of course, at the polygraph, he then admits that, okay, yes, I may have given some documents over to Mr. Cooper or his lawyer. He remembers. Now, Mr. Rashelle was terminated. The white male was terminated. Mr. Green was demoted. Now, Mr. Rashelle does go to the board, which is independent from the city. And Mr. Rashelle did get his job back. That's how it goes sometimes. Now, moving on to Clark, he does not establish a prima facie case either. Same thing. There was no replacement in that situation because the narcotics division, which he was the commander of, was subsequently, I guess, combined with another agency. He tries to identify Mr. Fairbanks, which you heard about. As a comparator, Judge Joseph analyzed that and determined that under the Ernst test, he's not a valid comparator. He doesn't have the same job titles. Fairbanks was a corporal, so basically two ranks below where Lieutenant Clark was. Lieutenant Clark obviously had different duties as he was the commander of narcotics. They did not have the same supervisors. Lieutenant Clark was under Captain Daryl Bradley. Corporal Fairbanks was under Lieutenant, at the time, Lily Evans, who's now the assistant chief. So the court obviously said they're just not valid comparators. And there was no, even on the analysis of what they did, Clark's behavior with the NCIC system was far reaching. There was 15 names that were looked up for various reasons. There were family members. There were political figures. There were all kinds, the chief of police at the time, other employees in the department. What does the NCIC database contain other than prior arrests? You can get your criminal history. You can get socials. Let's see, what else can you get? Social? I believe so. Really, it's a comprehensive system. It's almost like Google. I didn't know it went that far. There's a platform called Thinkstream that kind of goes to all, a bunch of different databases and whatnot.  It's kind of scary in some ways. So that's why people aren't supposed to use it except for business. Correct, correct. So moving away from the comparators and going straight to the pretext, even if you grant them a prima facie case, which as it relates to Greene and Cooper, that's not possible because they don't even try. Then as it relates to Clark, let's say you grant it for him. He has to then rebut every single reason that the city puts forth for his discipline. You didn't hear that. You didn't see it in the brief either. He violated rules, which the rule is very clear. It just says, hey, I think it's APD rule in regulation 609.5, if I may have that slightly off, but do not use the system for personal reasons at all, right? It's not a difficult rule. You don't need training for that. To me, the training defense is pretextual, not the reasons for the discipline. The legitimate non-discriminatory reasons, they write themselves. Assistant Chief Cooper, he was terminated because he, unfortunately, was helping an attorney, who then became his attorney later on, file a civil suit against the city. The city knew nothing about the FBI when the investigations started. That's a critical part that's missing from this. They're trying to establish this timeline, which there's really no proof of the timeline. There's no evidence in the record of the timeline other than their own self-serving testimony, but they talk about something that happened in March. That's their alleged reporting. The investigations into Clark and Cooper start in May, and they're told as to why they're under investigation once they get to the hearing, which is what the state statute required, the interrogations, rather. They're told that, hey, we think you guys may have been talking to this plaintiff, so that the guy that they're saying allegedly was hit filed suit. That's what started all of this. He filed a lawsuit. Keep in mind, this incident starts in March of 2019. Then all of a sudden, in April of 2020, we get sued. That's what starts all of this, because you see that the lawsuit is as if someone completely read reports, watched videos. That's what started the lawsuit, a fear that someone in the department was leaking information out to someone who was using it for a lawsuit. That was what started the investigation. During one of those interrogations, which I conducted the interrogation, at one point, that's when they mentioned that they were talking to an FBI agent. Actually, they mentioned him by name. I didn't know the guy's name, and then they later clarified. Even at the polygraph, the question is other than the FBI, because we're not worried about that. That's the question. Other than the FBI, and he mentioned his wife as well, have you disseminated any information? He failed that test. You have the suspicion of, hey, there's a lawsuit with too much information in it, and then you have the failed polygraph. That's the legitimate non-discriminatory reason. Of course, if the assistant chief is leaking information out to the public for purposes of a lawsuit against the city, that's easy. Cedric Green, same thing. He is a lieutenant over records, mind you. Information goes out to Cooper. Now, he admits this, so that alone stops the whole pretext thing, because he acknowledges it. At the polygraph, he admits, yes, I gave this information out. The question, then, or what they try to do is, hey, he didn't know it was confidential. That's belied by the record as well. He himself signed a document. This is in the record. It says, hey, city of Alexandria, do not give my personal information out. But yet, he gives his information and everybody else's out, and then tells us he didn't know it was confidential. That's a nonsensical position to take. For purposes of time, I'm going to move on. Well, I'll briefly say with Clark, it's a crime to misuse the NCIC system, 15, I think, 596. Our rules say that you can't do it. He acknowledges that at his predisciplinary hearing, that it is a serious offense. You have an affidavit from Ronnie Howard that it is a serious offense. We already talked about the comparator, who is a much lower rank than he was. And then you also have one of the other comparators is a black male, too. But the court said it wasn't valid. Going on to the, I'm going to jump to the retaliation real quick so I can dispose of that just as fast. Simple, same thing. The temporal proximity, first, they didn't prove it up. But give it to them. Legitimate, nondiscriminatory reason, it's harder in the retaliation context. I mean, yeah, because it's a but-for at that point. It's a but-for analysis. And, of course, if you have an assistant chief who's leaking information out and failing a polygraph, which the Louisiana Supreme Court has already told us is grounds for termination, of course it's a legitimate, nondiscriminatory reason. Then you have Lieutenant Green at the time. He has now admitted to giving out information. When we initially interrogated him, he said he didn't. When faced with a polygraph, he said he did. That's what we call inconsistent statements. These are not difficult concepts before the court. And to make matters worse, just a few months ago, we had terminated Kenny Rashelle, and they don't talk about that. So it wasn't like the city was doing anything discriminatory to him. That's just what you do when someone who's holding a position of trust leaks out information. Going to the hostile work environment claim, they don't have any evidence. And that's the issue here. They have to point to evidence. They can't just rely on their affidavits, which are merely, you know, conclusory. They're allegations. You can't rest on just that. You have to have more. And they don't do that. In large part, they're relying on things like their complaint. So, for example, there's an allegation that the N-word was permeated throughout the department. There's no citation to anything else other than the complaint. That's their allegation, their complaint and the third complaint. That's theirs. It makes no sense. You can't rely on that. They also go to say there were all these different events that happened. And Judge Joseph did a great job just going through all these different events. And first, he's like, hey, you're over-exaggerating these things when you look at it. We argue that in our brief. There's only really one instance of the N-word that we can see from the record. A lot of these things were isolated over a span of 30 years. It's not as if things are happening rampantly. The next step of it is that once you start to break it down into each person, like Green, for example, you know, the court went over five different things and the court said, of the five, four of them had nothing to do with you. You don't even allege that you were around, that you don't have personal knowledge of these things. These are just things you may have heard. Now, there was a comment directed at Green, which I find reprehensible. But it was one incident, either in 2011 or 2013. And that's the Trump monkey comment. That's not enough to establish a severe and pervasive or pervasive. That's outside the statute of limitations, isn't it? I would agree. But what they've done is tried to cobble everything into one big pot. But one incident, just one incident. If you look at Clark, Clark's affidavit begins with two or three pages of incidents that have nothing to do with him and ends with two or three pages of incidents that have nothing to do with him. If you look at his affidavit, if you look at his HR complaint, what's clear is him and Chief King don't like each other. But what's not clear is that there's any kind of race-based decision making on the part of the city as it relates to Clark. Another convenient point, Chief King, because of this personal animosity, because Chief King was a victim of one of the violations, was completely recused from the investigation. Didn't have a say in the matter. Also, in police work, at least for the city of Alexandria, the chief does not make the final decision on discipline. That goes to the mayor, who at the time was a black man. So it's just kind of where we're at. But as far as Clark here, he does point to the colored coalition statement, which again, the one thing I do disagree with Judge Joseph on, Chief King didn't make those comments. If you read Clark's affidavit, there were rumors to Chief, rumors that a joke was told to Chief King that his staff was about to be a colored coalition. And Clark's interpretation of that was that Chief King didn't like the fact his command staff was going to be mostly or completely black. They don't point to anything that Chief King said. So again, that doesn't really get you there as well. The reality is we're talking about one or two instances. I love the principle that was in the Shepard case when we're talking about Title VII. What we're talking about is trying to prevent conduct that stops you from succeeding in the workplace. These men were all succeeding. Cooper had risen to the assistant chief. That is the highest civil service position in the department, the highest civil service promotional position, the chief of civil service as well. Green, I wanted to call him Deputy Chief Green because he was the deputy chief at one point. He was demoted by his own admission because Chief King didn't think he was loyal. Whether or not Chief King was right in that assumption is not the point. It's not a race decision. Then the demotion about from lieutenant to sergeant, again, that's not a race decision. That was just his behavior. That's his conduct. At that point, he was demoted by not Chief King because he wasn't at the department. He was demoted by Chief Ronnie Howard, another black male. This is not a race. These are men who were at the top of the department. Lieutenant Clark was commander of narcotics. He was up to be captain at some point. This is just a situation where you have individuals who unfortunately made decisions that cost them their statuses. If I have two minutes left, so I wanted to reserve some time for any questions that the panel had. Thank you. No questions. Well, now that you've heard the rest of the story, I hope that you affirm the city's position. Thank you. Ms. Platoon? Yes, Your Honor. First, I just wanted to point out, I think that the city, in their brief, when we're looking at the context of First Amendment retaliation, I think we have a little bit of a different standard than a Title VII analysis. I think I just want to refocus on the standard that the city has to establish in that First Amendment retaliation claim is that they would have taken the same action against these men, even in the absence of the protected speech. And that the speech is, the element of the prima facie case is that the speech is a motivating factor in the employment decision. And I think that that has occurred here according to the timeline established by the plaintiffs, as well as their allegations of pretext for each of the reasons given for their adverse employment actions. And for that, we rely on the case Mooney v. Lafayette County Schools, that it is an unpublished case, but it does provide kind of this clear analysis of the way that a First Amendment retaliation claim is going to be assessed just a little bit differently than a Title VII retaliation claim. And I think recognizing that First Amendment rights are, that they take care not to grant summary judgment so easily as you would in a Title VII claim when you're dealing with kind of these delicate constitutional rights and these mixed motivations of people is just more proper for a jury to be assessing and addressing those issues. As to the fact that, I'll switch I think to the issue of Clark, Cooper, and Green having been promoted is true, but I think we also have to consider the end of the story, which is that they were all fired and demoted by the end of this story, which they claim is a result of retaliation for First Amendment speech as well as discriminatory purposes. And their evidence of that discriminatory intent also has to do under the hostile work environment, but also for their discriminatory firing and demotion. To bring it back to this colored coalition statement, I think there was, there's a reference in the record to King using the term, this is at 3249 in the record, a transcript from July 1st of 2020. And then as to the circumstances of these allegations of these other discriminatory terms that were used throughout the 30 years of their employment, and the district court did kind of assess each one and dismiss them as either not being directed at Clark, Cooper, or Green, or dismiss it just as not being sufficiently severe or pervasive. But I still want to bring focus to those events, the KKK references, the N-word, the nappy hair, the trunk monkey. Can you raise anything that's well outside the statute of limitations in order to show actionable hostile environment? I think that hostile work environment has to do with like a collection of events that is treated as one. So you could go back 25 years? No, but it's part of the record. It's part of what we have here in terms of what Clark, Cooper, and Green have established as their experience over their years in the department. And what I would point to here is just, does the existence of these things make it more or less likely that as black men rising in the ranks of this department, does it make it more or less likely that they were actually circumvented in their authority once they reach these levels? Does it add credibility to that testimony that they would present at a trial? And I say that it would. And so that's why I would want to bring focus to that. And then I think that's all I have. We would just ask that this court reverse and remand to the district court for further proceedings so that these claims can be heard by a jury. Thank you. All right. Thank you very much. We have concluded our cases for today and we'll resume tomorrow.